# Exhibit B

## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

IN RE:

Social Media Adolescent Addiction/Personal
Injury Product Liability Litigation

MDL Docket No. 3047

## RESPONSE OF PLAINTIFFS BRITTNEY DOFFING *ET AL.*
## TO MOTION FOR TRANSFER AND COORDINATION OR
## CONSOLIDATION UNDER 28 U.S.C. § 1407

Pursuant to Rule 6.1(c) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation ("the Panel") and the Panel's August 17, 2022 Order (ECF No. 26), Responding Plaintiffs[1] submit this response to the motion for centralization and transfer filed on August 1, 2022. As explained below, the Panel should centralize the Related Actions[2] for coordinated pretrial proceedings, in light of the myriad common questions of fact that exist and the tangible efficiencies that would result from centralization. Moreover, the Panel should transfer the cases to the Northern District of California, given a confluence of factors discussed below (including the presence of many of the Defendants there). Alternatively, the Panel should transfer the actions to the District of Oregon, which is a short flight from the San Francisco Bay Area and has numerous factors to recommend it (including the capacity of that district to take on a major new MDL).

---

[1] Responding Plaintiffs are Brittney Doffing; Tammy Rodriguez; Donna Dawley; Ashleigh Heffner; Brandy and Tony Roberts; Blair and Gregorio Aranda; Darla Gill; Alexandra, Benjamin, and Jennifer Martin; C.N. and Candace Wuest; Damian Johnson; M.C.; Gail Flatt; Jennifer Mitchell; and T.K.

[2] As used in this Response, Related Actions collectively refers to both the actions identified in the Movant's Schedule of Actions (ECF No. 1-2) and in Responding Plaintiffs' Schedule of Related Actions that accompanies this Response as Exhibit A thereto.

## BACKGROUND

Each of the Related Actions stems from a common set of allegations:  that Defendants' social media products[3] are designed to induce minors to use Defendants' products in obsessive ways—behavior that has been characterized as addictive, both by Defendants in internal documents and by scientists in published scholarship.  This addiction is harmful in and of itself—problematic use of social media is linked to a set of serious harms, including higher rates of depression, anxiety, eating disorders, self-harm, and suicide.  Making matters worse, some of the design features that are conceived to encourage engagement with Defendants' platforms make minors vulnerable to sexual predation by adult users.  The harms caused by this addiction are exacerbated by the failure of each Defendant to implement safety features to prevent children under legal age[4] from using their product and to allow parents to monitor their children's use of the product.  Some of the Related Actions involve only a single Defendant; others involve two or more Defendants, in various combinations.  No action involves all of the Defendants.

The product features at issue in this litigation are similar for each Defendant's product. A few examples are identified below:

- Each Defendant's product either allows or allowed minor children to set up their social media profiles as "public," or even (until last year in the case of Meta's Instagram platform

---

[3] The Defendants in the various actions filed by Responding Plaintiffs or by Movant are Meta Platforms, Inc. f/k/a Facebook, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, and Siculus, Inc. (collectively, "Meta"); TikTok Inc. and Bytedance, Inc. (collectively, "TikTok"), YouTube, LLC; Google, Inc.; Alphabet, Inc.; and Snap Inc ("Snap").  Meta operates the social media platforms Facebook and Instagram. TikTok operates the social media platform TikTok. Alphabet operates the video-sharing and social media platform YouTube. Snap operates the social media platform Snapchat.

[4] The Children's Online Privacy Protection Act requires websites to obtain parental consent before using the data of a child under the age of thirteen.  15 U.S.C. § 6502(b)(1)(A)(ii).

and the TikTok platform) *defaulted* them to a "public" profile—meaning that adult strangers have been able to view and message those children.

- None of the Defendants' products is structured to notify parents concerning basic information needed to monitor their children's behavior—such as the amount of time their children are spending on platforms, what hours of the day they are connected, or when they are contacted or solicited by adults.

- None of the Defendants' products contain meaningful age-verification requirements—each relies on users accurately providing their own age.

- Each of the Defendants' products employs algorithmic recommendation processes that affirmatively direct predatory adults to minor users.

- Each of the Defendants' products uses unpredictable and uncertain rewards—designed to exploit minor users' limited impulse control—in order to incentivize greater use of Defendants' platforms.

- Each of the Defendants' products relies on an unlimited scrolling feature—either in their main feed or in additional feeds such as "Discover" feeds—to provide a constant stream of content to minor users without employing safety features that would identify problematic use and halt the feed.

It is no accident that Defendants' products have such common defects. In the modern technology industry's fast-paced competitive environment, it is common for technology companies to copy each other's profitable mechanics. Social media is no exception. When Instagram, then an independent company (but now part of Meta), began to be a competitive threat to Facebook, Mark Zuckerberg, founder of Facebook (later renamed Meta) launched a plan to respond to Instagram and other "networks that are competitive with [Meta's] own" by "building

their mechanics into our products" and "incorporating their innovations into our core products[.]"[5] Mr. Zuckerberg's competitors have done the same—copying each other's design features, particularly those design features most likely to increase user engagement.[6] This copying often is done by the very same engineers who designed the original product feature—for example, when TikTok first opened its Silicon Valley office, it hired employees away from Meta and Snap.[7] Silicon Valley firms also coordinate on developing certain product features through industry-wide events, such as Habit Summit, a regular Silicon Valley event focused on how to create more addictive products. Because of this, many of the design features that Responding Plaintiffs allege are defective appear in each Defendant's products.

Defendants' intense competition for minor users also means that there is enormous overlap between the minor users of each of those products—and, consequently, many injured plaintiffs have claims against more than one Defendant. The injuries alleged in those cases are largely indivisible. For example, in the *Rodriguez* action from the Northern District of California—the action furthest along in its procedural posture (with a prior ruling on a 28 U.S.C. § 1404 motion to transfer venue and Defendants' briefing of a Rule 12(b)(6) motion to dismiss)—Selena Rodriguez began using social media at the age of nine without parental knowledge or consent. She quickly

---

[5] Casey Newton and Nilay Patel, *'Instagram Can Hurt Us': Mark Zuckerberg Emails Outline Plan To Neutralize Competitors*, The Verge (July 29, 2020), https://www.theverge.com/2020/7/29/21345723/facebook-instagram-documents-emails-mark-zuckerberg-kevin-systrom-hearing.

[6] Nicole Nguyen, *TikTok Isn't the First—or Last—App Instagram Copies*, The Wall Street Journal (Aug. 9, 2020), https://www.wsj.com/articles/tiktok-isnt-the-firstor-lastapp-instagram-copies-11596978000.

[7] Salvador Rodriguez, *TikTok has moved into Facebook's backyard and is starting to poach its employees*, CNBC (Oc. 14, 2019), https://www.cnbc.com/2019/10/14/tiktok-has-mountain-view-office-near-facebook-poaching-employees.html.

opened accounts with Instagram, Snapchat, and TikTok, which she used compulsively, to the point where she was getting as little as two hours of sleep each night. By mid-2021, Selena was communicating with over 2,500 different individuals, all but a handful of whom were complete strangers to her and many of whom were adult users of Defendants' products. While on Instagram and Snapchat, she was repeatedly solicited (sometimes by the same users on both products) for sexually explicit pictures of herself, which she eventually was pressured into providing. Selena committed suicide at age eleven due to the psychological harm caused by the effects of Defendants' products on her, posting a video of her suicide to Snapchat. *See* Second Am. Compl. ¶¶ 18-21, 25-60, 103-45, *Rodriguez v. Meta Platforms, Inc.*, No. 3:22-cv-00401-JD (N.D. Cal. filed May 6, 2022) (ECF No. 67) (asserting claims involving four Defendants). Selena's overlapping use of these products, and subsequent victimization across products, illustrates the intertwined nature of the allegations against multiple Defendants.

Selena is not alone in having injuries that are indivisibly linked to multiple Defendants. Indeed, the bulk of cases filed thus far (and the hundreds of additional cases that undersigned counsel anticipate filing) name multiple Defendants and allege use of multiple products. This is unsurprising. It is extremely common for American adolescents to use multiple Defendants' products that are at issue in the Related Actions.[8] As a result, this is not a situation in which a separate MDL for each corporate entity could feasibly be formed.

---

[8] Emily Vogels, Risa Gelles-Watnick and Navid Massarat, Pew Research Center, *Teens, Social Media and Technology*, August 10, 2022, https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022/.

## ARGUMENT

### I.     THIS LITIGATION SHOULD BE CENTRALIZED

The Panel may centralize and transfer civil actions involving one or more common questions of fact if it determines that such a transfer "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions."  28 U.S.C. § 1407(a). Section 1407 centralization "ensures that pretrial proceedings will be conducted in a streamlined manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties." *In re Lehman Brothers*, 598 F. Supp. 2d 1362, 1364 (J.P.M.L. 2009).  "'The basic purpose of assigning (multiple litigation) to a single judge is to provide for uninterrupted judicial supervision and careful, consistent planning and conduct of pretrial and trial proceedings' that will eliminate or reduce conflict and duplication of effort."  *In re Multidistrict Private Civil Treble Damage Litig. Involving Library Editions of Children's Books*, 297 F. Supp. 385, 386 (J.P.M.L. 1968) (quoting *Manual for Complex and Multidistrict Litigation* at 10 (1968)).

The Related Actions involve myriad common questions of fact, including:  whether the Defendants failed to warn users and their parents of the risks of product use; whether Defendants' platforms contain age-verification requirements; and whether the Defendants' social media platforms are addictive to children.  Moreover, centralization will achieve efficient and streamlined resolution of the actions.  Each Related Action involves similar, if not identical, causes of action. All will require overlapping discovery regarding the development and testing of each product's dangerous features, including each of the overlapping design features described above.  Each will inevitably involve discovery against common third parties, like the groups sponsoring the Habit Summit described above.  All of these actions, "regardless of the manufacturer, will share factual questions regarding general causation (in particular, the biological mechanism of the alleged injury), the background science, and common regulatory issues."  *In re Fluoroquinolone Prods.*

*Liab. Litig.*, 122 F. Supp. 3d 1378, 1379 (J.P.M.L. 2015). Furthermore, as noted above, because of the considerable turnover of employees between the major social media companies in this litigation, it is almost certain that there will be overlap in the witnesses needed to resolve claims against each Defendant. Centralization will ensure that discovery is coordinated and conducted efficiently. In addition, the cases all raise overlapping threshold issues that will be (and already have been) raised in initial Rule 12(b)(6) motions, including whether some or all of the allegations are barred by section 230(c)(1) of the Communications Decency Act), 47 U.S.C. § 230(c)(1), or by the First Amendment to the United States Constitution. Also, because the cases will involve extensive common expert testimony, it is likely that myriad *Daubert* motions will be filed. Separate rulings on these various motions would be inefficient and would create the potential for conflicting rulings.[9]

Another factor weighing in favor of centralization is that the bulk of these actions involve mixed use of each Defendant's product, resulting in indivisible injuries to the plaintiff. *See In re Proton-Pump Inhibitor Prods. Liab. Litig. (No. II)*, 261 F. Supp. 3d 1351, 1355 (J.P.M.L 2017) (centralizing in part because of "the seemingly indivisible nature of plaintiffs' alleged injuries in the 'mixed use' cases"). The Panel has long recognized that where many plaintiffs have claims against multiple defendants because they used each defendant's defective product, industry-wide

---

[9] *See*, *e.g.*, *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 437 F. Supp. 3d 1368, 1369 (J.P.M.L. 2020) (noting general causation issues would likely "be common across all the actions and would benefit greatly from coordinated treatment," and that centralization would prevent inconsistent pretrial rulings, including with respect to *Daubert* motion practice); *In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 410 F. Supp. 3d 1357, 1359 (J.P.M.L. 2019) ("centralization would eliminate duplicative discovery and other pretrial proceedings," as well as possibility of inconsistent rulings on *Daubert* motions); *In re Viagra (Sildenafil Citrate) Prods. Liab. Litig.*, 176 F. Supp. 3d 1377, 1378 (J.P.M.L. 2016) ("Centralization w[ould] eliminate duplicative discovery, [and] prevent inconsistent pretrial rulings on *Daubert* and other issues[.]").

centralization is appropriate because the alternatives to centralization "likely would delay the resolution of the common core issues[.]" *In re AndroGel Prods. Liab. Litig.*, 24 F. Supp. 3d 1378, 1379 (J.P.M.L. 2014).

Finally, the large number of pending actions (over 40 to date) strongly favors centralization[10]—as does the likelihood that scores (if not hundreds) of additional actions will be filed.[11]  Already, cases have been filed in no fewer than twenty different federal districts across the country.  Thus, other methods of case management, such as informal cooperation, consolidation, or transfer of venue are unlikely to be effective in achieving efficiency.

## II.  THE NORTHERN DISTRICT OF CALIFORNIA IS THE MOST APPROPRIATE FORUM FOR CENTRALIZATION

The selection of an appropriate transferee forum depends on the specific facts and circumstances of the litigation being considered for transfer and consolidation and involves a "balancing test" of several factors "based on the nuances of a particular litigation."  Robert A. Cahn, *A Look at the Judicial Panel on Multidistrict Litigation*, 72 F.R.D. 211, 214 (1977).  Factors relevant to this analysis include, but are not limited to, "where the largest number of cases is pending, where discovery has occurred, where cases have progressed furthest, the site of the occurrence of the common facts, where the cost and inconvenience will be minimized, and the experience, skill, and caseloads of available judges."  David F. Herr, *Annotated Manual for*

---

[10] *See, e.g.*, *In re Pacquiao-Mayweather Boxing Match Pay-Per-View Litig.*, 122 F. Supp. 3d 1372, 1374 (J.P.M.L. 2015) (common factual questions were sufficiently complex to warrant centralization "given the large number of related actions").

[11] *See, e.g.*, *In re Camp Lejeune, N. Carolina Water Contamination Litig.*, 763 F. Supp. 2d 1381, 1382 (J.P.M.L. 2011) (centralization supported where parties anticipated large number of additional related actions to be filed); *In re Celexa & Lexapro Mktg. & Sales Practices. Litig.*, 652 F. Supp. 2d 1377, 1377 n.1 (J.P.M.L. 2009) (centralizing two actions where parties advised Panel of four additional actions); *In re Corn Derivatives Antitrust Litig.*, 486 F. Supp. 929, 930 & n.2 (J.P.M.L. 1980) (centralizing 25 actions, with additional actions anticipated).

*Complex Litigation, Fourth* § 20.131, at 239 (rev. ed. 2022); *see In re Regents of Univ. of Cal.*, 964 F.2d 1128, 1136 (Fed. Cir. 1992) (in selecting most appropriate MDL transferee forum, Panel considers, among other things, (1) the location of the "broader-based" and "earliest filed" filed actions; (2) which court "ha[s] developed more familiarity with the issues"; (3) which court is "a centrally located forum" for witnesses and for counsel; and (4) the location of "relevant documents and witnesses") (citing cases).

These factors overwhelmingly favor the Northern District of California.   More Related Actions are currently situated in the Northern District of California than in any other forum.  *See* Movant's Schedule of Actions (ECF No. 1-2, at 2-10) (8 of 28 actions pending in N.D. Cal., with only 1 to 3 actions pending in 16 other districts); Ex. A (Responding Pls.' Schedule of Related Actions) (identifying 12 actions of undersigned counsel beyond the 10 already identified in Movant's Schedule:  9 additional cases in N.D. Cal., and 1 each in M.D. Fla., C.D. Ill., and D.N.J.); *see also* Notice of Related Action (ECF No. 33) (identifying M.D. Fla. action filed by Morgan & Morgan firm on Aug. 26, 2022).[12]

The case that has progressed furthest in this litigation—the *Rodriguez* action described above, pending before Judge James Donato—is situated in the Northern District of California.  As discussed at pages 11-12 below, the various Defendants have substantial connections with the Northern District of California.  *See In re Mun. Derivatives Antitrust Litig.*, 560 F. Supp. 2d 1386, 1387 (J.P.M.L. 2008) (selecting transferee district that represented "center of gravity" because "alleged wrongful activities" were "intimately connected" to it, many of the defendants were headquartered there, and "relevant documents and witnesses [we]re likely to be found there"); *In*

---

[12]  The undersigned anticipate filing two additional cases in the Northern District of California within the next week.

*re Am. Honda Motor Co., Inc., Oil Filter Prods. Liab. Litig.*, 416 F. Supp. 2d 1368, 1369 (J.P.M.L. 2006) ("Since Honda's principal place of business is located in this district, relevant documents and witnesses are likely located there.").

In addition, the undersigned have filed at least ten overlapping cases (involving 13 plaintiffs) in California state courts. *See*, *e.g.*, *Smith v. TikTok, Inc.*, No. 22STCV21355 (Cal. Super. Ct., L.A. Cty., filed June 30, 2022) (action involving 3 named plaintiffs). Also, the undersigned contemplates the filing shortly of two additional cases in California state court, both in the San Francisco Bay Area. It is quite possible that those cases will result in a coordinated proceeding under California's civil case coordinated litigation or complex case coordination process. *See* Cal. Civ. Proc. Code § 404; Cal. R. Ct. 3.400. But whether or not consolidation occurs on the state level, coordination of California state cases with a federal court in California would be much more efficient than coordination with a federal court elsewhere.

Also, San Francisco is a major hub not only for domestic travel but also international travel, particularly for travel to Beijing, where TikTok's parent company is headquartered. It has a large airport, direct flights to and from most major domestic metropolitan areas, and ample hotel availability. The Panel has often chosen as the transferee forum a district that is readily accessible and convenient, particularly where constituent cases in an MDL are already pending.[13] Moreover,

---

[13] *E.g.*, *In re Qualcomm Antitrust Litig.*, 273 F. Supp. 3d 1373, 1376 (J.P.M.L. 2017) (N.D. Cal. convenient forum for third parties and witnesses based in Asia); *In re Roundup Prods. Liab. Litig.*, 214 F. Supp. 3d 1346, 1348 (J.P.M.L. 2016) (selecting N.D. Cal. as transferee forum where "two of the earliest-filed and most procedurally advanced actions" were pending and it was both convenient and easily accessible for all parties"); *In re Viagra (Sildenafil Citrate) Prods. Liab. Litig.*, 176 F. Supp. 3d 1377, 1378 (J.P.M.L. 2016) (selecting transferee district providing "convenient and easily accessible location for … geographically dispersed litigation")*; In re Yosemite Nat'l Park Hantavirus Litig.*, 24 F. Supp. 3d 1370, 1371 (J.P.M.L. 2014) (recognizing N.D. Cal. as "an accessible and convenient forum," including "for parties located across the country"); *In re Circular Thermostat Antitrust Litig.*, 370 F. Supp. 2d 1355, 1357 (J.P.M.L. 2005) (N.D. Cal. "an accessible, metropolitan location"); *In re Compression Labs, Inc., Patent Litig.*,

considerations of accessibility are heightened where, as here, a number of the Defendants are based in the Northern District of California or have a substantial presence there.  Indeed, cases are legion where the Panel has determined the most suitable transferee forum is the forum where one or more defendants are based, making that forum easily accessible.[14]

Specifically, Meta Platforms Inc., which owns and operates Instagram, has its principal place of business in Menlo Park, California.  *See* Meta Platforms, Inc. SEC Form 8-K (Oct. 28, 2021), available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/e1b7c43d-175d-4702-a6bb-b42fbbb8cdd0.pdf.  Bytedance Inc., which owns TikTok, has its principal U.S. place of business in Mountain View, California.  *See* https://opencorpdata.com/us-wa/604151749.  Although headquartered in Culver City, California, TikTok itself has offices in Mountain View. *See supra* at 4 n.7 (CNBC article authored by Salvador Rodriguez).

Also, as detailed in Plaintiff Rodriguez's successful opposition to the 28 U.S.C. § 1404 motion to transfer her action, Snap Inc. maintains at least two offices in the Northern District of California (with no fewer than 592 employees there), and numerous witnesses and evidence

---

360 F. Supp. 2d 1367, 1369 (J.P.M.L. 2005) (N.D. Cal. "an easily accessible, metropolitan district"); *In re Gardasil Prods. Liab. Litig.*, No. MDL 3036, 2022 WL 3138681, at *3 (J.P.M.L. Aug. 4, 2022) (selecting transferee district where two constituent actions were pending and which "provide[d] a convenient and readily accessible forum for th[e] nationwide litigation").

[14] *E.g.*, *In re Monat Hair Care Prod. Mktg., Sales Practices & Prods. Liab. Litig.*, 325 F. Supp. 3d 1364, 1365 (J.P.M.L. 2018) (selecting transferee district where relevant documents and witnesses might be found because defendants were based there and district offered "a readily accessible and convenient transferee forum"); *In re Gen. Motors Corp. Air Conditioning Mktg. & Sales Practices. Litig.*, 289 F. Supp. 3d 1340, 1341 (J.P.M.L. 2018) (selecting transferee district where defendant headquartered and which "offer[ed] a readily accessible and convenient transferee forum"); *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, No. MDL 3037, 2022 WL 3134144, at *2 (J.P.M.L. Aug. 5, 2022) (selecting transferee district where defendant headquartered and which offered "a convenient and accessible district"); *In re Neo Wireless, LLC, Patent Litig.*, No. MDL 3034, 2022 WL 2129058, at *2 (J.P.M.L. June 14, 2022) (selecting transferee district where two defendants were headquartered and which was "a convenient and easily accessible location").

relevant to the claims in these litigations are to be found in that district. These include individuals involved in internal studies concerning the addictiveness of Defendants' products, Instagram's CEO, Meta's Chief Technical Officer and its vice president of engineering (the latter involved in 2016 changes to the platform's algorithms), former Meta employees and whistleblowers who have spoken out about addictive product design, and evidence and witnesses tied to the Defendants' participation in the Habit Summit, which has taken place in the Northern District of California.[15] No other district in the United States comes close to the Northern District of California in terms of the number and magnitude of contacts with the various defendants, witnesses, and documentary evidence.

Notably, the Northern District of California is a jurisdiction in which the Panel historically has placed great confidence, having transferred 8,756 cases to that court over the more than four decades from the Panel's 1968 inception to September 30, 2021.[16]  To be sure, the Northern District of California has a sizable civil docket, but it has been efficient in resolving cases. As of the twelve-month period ending on September 30, 2021, only 10 percent of all civil cases in the Northern District of California were pending for three years or more.[17] The median interval for

---

[15] *See* Pl.'s Opp. to Def. Snap Inc.'s Mot. to Transfer to the Cent. Dist. of Cal. at 2-4, *Rodriguez v. Meta Platforms, Inc.*, No. 3:22-cv-00401-JD (N.D. Cal. Apr. 14, 2022) (ECF No. 59 at 7-9) (citing supporting declaration and exhibits thereto); Order re Transfer, *Rodriguez*, No. 3:22-cv-00401-JD (N.D. Cal. May 25, 2022) (ECF No. 68) (denying transfer to C.D. Cal.); *see also* Janice Bitters, *Exclusive: Snapchat expands into Silicon Valley with lease in prime Mountain View office*, Silicon Valley Business Journal (Mar. 16, 2018), https://www.bizjournals.com/sanjose/news/2018/03/16/snapchat-silicon-valley-mountain-view-lease-snap.html.

[16] *Judicial Business of the United States Courts: 2021 Annual Report of the Director* ("*2021 Report*"), Table S-19, https://www.uscourts.gov/sites/default/files/data_tables/jb_s19_0930.2021.pdf.

[17] *See 2021 Report*, Table C-6, https://www.uscourts.gov/sites/default/files/data_tables/jb_c6_0930.2021.pdf.

disposition of civil cases overall was a mere 6.3 months, with the disposition interval during or after the pretrial stage only 16.7 months.[18]  Also, the median interval from case filing through completion of trial in civil cases in the Northern District of California was only 26.4 months.[19]  Historically, case disposition intervals have been a weighty consideration for the Panel.[20]

## III.    IN THE ALTERNATIVE, THE DISTRICT OF OREGON IS AN APPROPRIATE FORUM FOR CENTRALIZATION

Alternatively, the District of Oregon would be an excellent choice for the centralization of these cases.  Both Portland and Medford are easily reachable from San Francisco with short, nonstop flights, thus capturing the myriad efficiencies noted above for San Francisco.  Other factors also make Oregon an attractive alternative choice.

To begin with, the first filed and second most advanced Related Action—*Doffing v. Meta Platforms, Inc.*, No. 1:22-cv-00100-CL (D. Or. filed Jan. 10, 2022) (*see* Movant's Schedule of Actions, ECF No. 1-2, at 8)—is in the District of Oregon.[21]  As discussed above, the witnesses

---

[18]  *Id.*, Table C-5, https://www.uscourts.gov/sites/default/files/data_tables/jb_c5_0930.2021. pdf.

[19]  *Id.*, Table T-3, https://www.uscourts.gov/sites/default/files/data_tables/jb_t3_ 0930.2021. pdf.

[20]  *See In re Preferential Drug Prods. Pricing Antitrust Litig.*, 429 F. Supp. 1027, 1029 (J.P.M.L. 1977) (noting that median time from filing to disposition and from issue to trial for civil actions was "significantly shorter" in selected transferee district; *In re Nat'l Student Mktg. Litig.*, 368 F. Supp. 1311, 1318 (J.P.M.L. 1972) (comparing changes in proposed districts' civil dockets and noting that, "[e]ven more significantly," median time interval from issue to trial in civil cases in selected district was one-third less than that of other proposed forum); *see also In re Amtel, Inc. Secs. Litig.*, 447 F. Supp. 466, 468 (J.P.M.L. 1978) ("[A] comparison of the civil action dockets in the districts under consideration as possible ... transferee districts is a relevant factor for the Panel to take into account when making its determination[.]").

[21]  In *Doffing,* the parties briefed and argued a personal jurisdiction/transfer motion, and the federal magistrate judge has issued a report and recommendation for the disposition of that motion. *See Doffing*, No. 1:22-cv00100-CL (D. Or.) (ECF Nos. 37-39, 48-52, 59, 62, 65, 68-69).

and evidence in these litigations are in the western United States, making the District of Oregon a convenient forum. *See In re Farmers Ins. Exch. Claims Representatives' Overtime Pay Litig.*, 196 F. Supp. 2d 1373, 1375 (J.P.M.L. 2002) ("[T]he Oregon district is relatively convenient for most parties and witnesses who are located in the Western United States[.]"); *see also In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 110 F. Supp. 3d 1358, 1360 (J.P.M.L. 2015) (recognizing D. Or. as "a convenient and accessible forum").

Another consideration supporting centralization in the District of Oregon is the capacity of that District to handle new MDL litigation, and thus its ability to devote its resources to this litigation to ensure its expeditious resolution. Historically, the District of Oregon has transferred over twenty-fold the number of MDL constituent cases (1,288) out of the district than it has received (57), and for the fiscal year 2020-21 it transferred out 4 without receiving any new cases, with only 41 MDL constituent cases remaining as of that date.[22] Importantly, as of August 15, 2022 (the most recent date for which information is available on the Panel's website), not a single MDL is pending in that district.[23] These facts suggest that the District of Oregon's docket can easily accommodate a major MDL.[24] Also, like the Northern District of California, the District of

---

[22] *2021 Report*, Table S-19, https://www.uscourts.gov/sites/default/files/data_tables/jb_s19_0930.2021.pdf.

[23] *See* https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-August-15-2022.pdf.

[24] *See, e.g., In re Farmers Ins. Co., Inc., Ins. Premiums Litig.*, 295 F. Supp. 2d 1375, 1377 (J.P.M.L. 2003) (assigning "litigation to a district which does not currently have any other multidistrict litigation docket and to a judge whose caseload [wa]s favorable to accepting this assignment"); *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 293 F. Supp. 2d 1378, 1380 (J.P.M.L. 2003) (selecting transferee forum that "does not currently have any other MDL assignment"); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 290 F. Supp. 2d 1374, 1376 (J.P.M.L. 2003) (transferee court did "not currently have multidistrict dockets," and "enjoy[ed] general docket conditions permitting the Panel to effect the Section 1407 assignment to a court with the present resources to devote to the pretrial matters that this docket [wa]s likely to require").

Oregon boasts an impressive case resolution rate. As of the twelve-month period ending on September 30, 2021, only 10.3 percent of all civil cases in the District of Oregon were pending for three years or more.[25]

Importantly, a number of the judges in the District in Oregon (including the Chief Judge) have never been assigned to an MDL. An assignment to such a judge would promote the Panel's salutary objective of assigning some MDLs to judges who have not previously had such assignments.[26] In short, if the Panel decides that the Northern District of California is not a suitable district, the District of Oregon is a viable, nearby alternative.

---

[25] *See 2021 Report*, Table C-6, https://www.uscourts.gov/sites/default/files/data_tables/ jb_c6_0930.2021.pdf.

[26] *See*, *e.g.*, *In re TransUnion Rental Screening Sols., Inc., Fair Credit Reporting Act Litig.*, 437 F. Supp. 3d 1377, 1378 (J.P.M.L. 2020) (choice of transferee judge "allows us to assign this litigation to an able jurist who has not yet had the opportunity to preside over an MDL"); *In re Gardasil Prods. Liab. Litig.*, No. MDL 3036, 2022 WL 3138681, at *3 (J.P.M.L. Aug. 4, 2022) (noting that transferee judge was "a skilled jurist who has not yet had the opportunity to preside over an MDL"); *In re Neo Wireless, LLC, Patent Litig.*, No. MDL 3034, 2022 WL 2129058, at *2 (J.P.M.L. June 14, 2022) (choice of transferee judge "allows us to assign this litigation to a jurist who has not yet had the opportunity to preside over an MDL").

15

## CONCLUSION

For the foregoing reasons, the Panel should (1) grant the motion for transfer, and (2) centralize the Related Actions for coordinated pretrial proceedings in either the Northern District of California or the District of Oregon.

Dated:  August 30, 2022

Respectfully submitted,

/s/ Christopher A. Seeger
Christopher A. Seeger
cseeger@seegerweiss.com
Diogenes P. Kekatos
dkekatos@seegerweiss.com
Christopher L. Ayers
cayers@seegerweiss.com
Nigel Halliday
nhalliday@seegerweiss.com
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  (973) 639-9100

Matthew P. Bergman
matt@socialmediavictims.org
Glenn Draper
glenn@socialmediavictims.org
**SOCIAL MEDIA VICTIMS**
  **LAW CENTER**
821 Second Avenue, Suite 2100
Seattle, WA  98104
Telephone:  (206) 741-4862

Laura Marquez-Garrett
laura@socialmediavictims.org
**SOCIAL MEDIA VICTIMS**
  **LAW CENTER**
1390 Market Street, Suite 200
San Francisco, CA  94102
Telephone:   (206) 294-1348

Robert H. Klonoff
klonoff@usa.net
2425 S.W. 76th Avenue
Portland, Oregon 97225
Telephone:  (503) 702-0218

Jennie Lee Anderson
jennie@andrusanderson.com
**ANDRUS ANDERSON LLP**
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone:  (415) 986-1400